

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00043-CV

_____

WERNER CO., Appellant

V.

J. DeVallee, Appellee

_____

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 2011-40709-362

_____

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

In this products-liability case, appellant Werner Co. appeals a sizeable judgment in favor of appellee John DeVallee. Werner challenges the legal sufficiency of the evidence to support the core elements of DeVallee's products-liability claim, as well as the factual sufficiency of the evidence to support his damages. We find the evidence legally sufficient to bear out DeVallee's design-defect theory. But we agree with Werner that at least one category of future damages was unsupported by factually sufficient evidence. We therefore suggest a remittitur.

## I. Background

On February 16, 2011, DeVallee went to Oklahoma to make sales calls for his employer Enpro Distributing, which sold window blinds. While DeVallee was in the area, Enpro sent him to repair a broken chain on a set of blinds at an AT&T store. DeVallee entered the store with a four-foot Werner ladder that he had purchased the month before. He set the ladder up beneath the blinds, climbed it, and began working on the chain.

At some point, the ladder tipped over to the left, and DeVallee with it. There were differing accounts of how the accident occurred. According to DeVallee, he was standing on the second step, squarely centered and working on the chain directly in front of him when something caused him to fall; he testified that his recollection was foggy due to his injuries and loss of consciousness. According to a store employee

2

named Thomas Vance, DeVallee was on the third step of the ladder, reaching up to the top of the blinds and leaning off to the left when he lost his balance.

When DeVallee tried to catch himself, he broke his right wrist and cracked his tooth. The wrist injury required multiple surgeries and left DeVallee with persistent pain and limited mobility. As relevant here, DeVallee sued Werner claiming that the ladder was defectively designed and marketed.

At trial, DeVallee's expert L.D. Ryan told the jury that the ladder suffered from a design defect: the ladder was overly flexible and allowed an ordinary user to inadvertently twist or "rack" the ladder several inches as he climbed it. According to Ryan, when an average ladder is racked, its legs are unevenly placed such that one leg dangles in the air, and it is inherently unstable and liable to shift underneath the user "like a bucking bronco." He theorized that the racking problem might have been exacerbated by the design of the ladder's front legs, which had a C-shaped design that could rotate when the ladder was under a load. Ryan opined that DeVallee must have inadvertently twisted the ladder when he climbed it and that the resulting instability caused him to fall. By Ryan's account, this flexible play in the ladder could be limited by at least three different feasible designs that would cost-effectively enhance the ladder's rigidity, and thus safety, without impairing its utility.[1]

---

[1]A lesser aspect of Ryan's testimony was that due to the poor design of the ladder's legs, the front left leg of the ladder might have buckled under DeVallee, causing him to fall. Similarly, DeVallee testified that he believed the ladder crumpled

Various other witnesses also testified at trial. DeVallee presented expert medical testimony concerning his injury and treatment, as well as his pain and medical needs. DeVallee's brother told the jury about the heavy toll that the accident had taken on DeVallee and his quality of life. Werner's expert and corporate representative Frederick Bartnicki disputed the notion that the ladder was defective; he testified that the ability to twist or rack is not a defect but an essential feature that allows the ladder to be safely used on uneven surfaces.

After the close of the evidence, the jury found that the ladder had design and marketing defects that caused various forms of damages in a total amount of $4,791,582.78. Werner appeals.

## II. Legal Sufficiency of the Evidence on Defective Design

In its first issue, Werner asserts that the evidence is legally insufficient to show that the ladder suffered from a design or marketing defect and that any defect caused DeVallee's injury. As to defective design, Werner primarily relies on the evidence that it presented at trial to support the ladder's safety, to show that alternative designs would not meet the same needs, etc. However, the jury could have rationally disregarded that evidence and instead focused on the countervailing evidence that DeVallee presented concerning the same issues. As we explain, DeVallee's evidence provides more than a

---

underneath him. However, aside from these two fleeting mentions, DeVallee produced no further evidence to support this lesser defect theory, and we therefore generally confine our discussion of alleged design defects to Ryan's racking theory.

4

scintilla of support for each of the five factors by which we evaluate whether the ladder was defective.

We may sustain a legal-sufficiency challenge only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Shields L.P. v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996); *see also 4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 909 (Tex. 2016) ("The evidence is legally sufficient if . . . there is more than a scintilla of evidence on which a reasonable juror could find the fact to be true."). Scintilla means a spark or trace. *Scintilla*, Black's Law Dictionary (10th ed. 2014). More

than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins.*, 77 S.W.3d 253, 262 (Tex. 2002); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). On the other hand, when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

To recover on a products-liability claim based on an alleged design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous, (2) a safer alternative design existed, and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery. *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 6 (Tex. 2015). Whether a defective design renders a product unreasonably dangerous depends on whether the product's risks outweigh its utility, considering a five-factor test: (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious

6

condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer. *Id.* at 9–10.

## A. The utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use

According to Ryan, the ladder in question racked excessively, and he testified concerning the dangers of such a ladder. Ryan explained that when a ladder is twisted or racked, the ladder becomes unstable, and that instability directly contributes to the risk of injuries "because it's like a bucking bronco. The thing will move on you." Ryan testified that dating back to the 1970s, manufacturers had documented the need to address racking in order to make ladders safe. Ryan tested the model of ladder that was involved in DeVallee's accident, and he found that even under moderate stress, the ladder racked between 5.75 and 8.25 inches.

Moreover, the primary evidence concerning the ladder's alleged benefits was flawed. According to Werner's expert, the principal virtue of designing a ladder to allow significant racking is that it is conducive to use on uneven surfaces: the twisting and flexing of the ladder allows the legs to adjust to the contours of uneven terrain. However, in its written warnings on the ladder, Werner forbade using the ladder on uneven surfaces. Thus, the supposed benefit of the racking feature was forbidden to all prudent users. Werner's argument concerning the benefits of racking is self-defeating. *See Jackson v. Michelin N. Am., Inc.*, No. 07-16-00325-CV, 2018 WL 4323624,

at \*5 (Tex. App.—Amarillo Sept. 10, 2018, pet. denied) (mem. op.) (reasoning that a products-liability party's "circuitous reasoning defeats itself").

To combat DeVallee's case on the relative merits and demerits of a racking ladder, Werner also introduced statistics reflecting that relatively few injuries had been reported regarding this particular model of ladder. We agree that this sort of evidence was probative in Werner's favor. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 139 (Tex. 2004) (recognizing the validity of a defendant's wish "to introduce evidence of . . . the *absence* of other accidents to rebut claims that a product was dangerous"). However, it is not conclusive. *See id.* at 140 (holding that the number of complaints alone is not conclusive on the issue of unreasonable dangerousness); *Gamboa v. Centrifugal Casting Mach. Co.*, No. CIV.A. H-14-1273, 2015 WL 6835359, at \*6 (S.D. Tex. Nov. 6, 2015) (mem. op. & order) ("Texas case law suggests that the frequency of similar accidents is not alone dispositive of the unreasonable dangerousness inquiry.").

Despite Werner's statistics concerning accident frequency, then, the record holds more than a scintilla of evidence in DeVallee's favor on the first factor.

**B.     The availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive**

**C.     The manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs**

Through Ryan's testimony, DeVallee introduced the jury to three alternative designs that would address the racking problem. The first was a ladder with a "spreader

8

plate" fixated between the legs to keep its frame more rigid. In Ryan's view, the use of a spreader plate would reduce racking considerably, it would be economically feasible to equip a ladder with such a plate, and it would not impair the ladder's functionality. According to Ryan, "All it does is make it safer." However, he conceded that attaching a spreader plate would increase the ladder's weight by about two pounds.

Second, Ryan theorized that the ladder could be made safer by integrating two crossing chains attached to the bottom of each leg. Ryan said that such a feature would not be difficult or expensive to incorporate into the ladder's design. As Ryan saw it, this feature would substantially reduce the risk of racking and would make the ladder safer. He also described it as economically feasible and maintained that it would not interfere with the ladder's functionality.

Third, Ryan testified that the racking and rotation problem could be addressed from another design perspective: altering the legs, making them rectangular as opposed to C-shaped so that the ladder legs had less natural tendency to twist and could better resist racking. Ryan told the jury that this type of design was readily available at the time of DeVallee's accident. Ryan attested that rectangular leg-tubing is economically feasible, would not affect a consumer's ability to use the ladder in any way, and would substantially reduce the ladder's risks.

According to Ryan, all three designs were technologically feasible and readily available on the market at the time of the accident, and he had found old patents indicating that some of the designs had long ago been integrated into ladders.

9

The record holds more than a scintilla of evidence in DeVallee's favor on the second and third factors.

**D.     The user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions**

**E.     The expectations of the ordinary consumer**

Ryan testified that consumers are generally not familiar with racking or the risks inherent therein. Ryan further explained that the racking problem was a subtle one that might come on unexpectedly; someone might be climbing the ladder, look down, and see that all "four legs are on the ground. It all looks good to [you]. But you get up and you're tired, and you—what happens is the ladder comes up, and there's only three feet on the ground. And that makes it unstable." Further, it was Ryan's belief that Werner didn't adequately warn the public about the danger because the warnings on the ladder did not caution users on how to climb the ladder in a way that kept it from racking. Ryan agreed that the ladder's warnings advised users not to "walk" the ladder, but he maintained that the public would not know what "walking" the ladder meant.

DeVallee also addressed these factors by way of anecdotal evidence. He testified that he was experienced with ladders, having used them all his life and sold them in hardware stores during his younger days. But DeVallee testified said that he had never heard of racking before his injury and that the warnings he read on the ladder did not apprise him that racking was a risk.

10

In analyzing these factors, we refer to the opposing guideposts that were discussed in *Matak*. *See* 462 S.W.3d at 10–11. There, a user of a mechanical lift disconnected the lift's support braces or "outriggers" while another man was suspended forty feet in the air, causing the lift to topple. *Id.* at 6. The court held that the risks of such a maneuver should have been readily apparent to the lift's user. *Id.* at 11. The court contrasted this obvious danger with the subtler one discussed in a prior defect case involving a tire explosion:

> On the other hand, in *Uniroyal Goodrich Tire Co. v. Martinez,* we held that there was a factual dispute for the jury to decide. There, Martinez was injured when a 16" tire he was attempting to mount on a 16.5" rim exploded. That such mismatches occur frequently and easily was well known in the industry—hence the warnings and recommended safety precautions. Martinez himself knew of the danger, but testified that he mistakenly believed, because the old tire was 16", that the rim was also 16". He might have avoided injury from an explosive mismatch between the tire and the rim if he had available (and used) a tire-mounting machine, a safety cage or an extension hose while inflating the tire. Nonetheless, because even experienced operators like Martinez could mistakenly believe they were in compliance with the warning against mounting a 16" tire on a 16.5" rim, there remained a latent risk that a person unaware he was mounting a 16" tire on a mismatched 16.5" rim would fail to appreciate the concomitantly increased danger posed by an unsecured tire. The Court concluded that whether there was a safer alternative design for the tire that would have decreased the likelihood of an explosion was a question for the jury. In the case at hand, a person on the ground can readily see that lifting the outriggers on a lift, while the platform bearing his colleague remains 40' in the air, puts that colleague at serious risk of a potentially deadly fall. The ground-based lift-user cannot mistakenly believe that his actions are safe, as Martinez mistakenly believed based on the misapprehension that the tire and rim matched.

*Id.* at 10–11 (internal citations omitted).

Here, as in *Martinez,* an experienced ladder user testified that despite having read the product's warnings, he did not appreciate the hidden risks of the product in question, and the jury could have rationally believed that his mistake was an easy one. His testimony was corroborated by Ryan's testimony concerning general consumer awareness of the ladder's risks. We therefore conclude that the peril in this case is more like the subtle danger discussed in *Martinez* than the obvious danger at issue in *Matak.* The record holds more than a scintilla of evidence in DeVallee's favor on the fourth and fifth factors.

## F.    Conclusion

Because there is more than a scintilla of evidence in DeVallee's favor on each of the five factors, we hold that the evidence is legally sufficient to support the jury's finding that the ladder was defectively designed.

## III.    Legal Sufficiency of the Evidence on Causation

Also within its first issue, Werner brings a narrowly drawn challenge to the legal sufficiency of the evidence on causation. As Werner points out, both of the witnesses who observed the accident agreed that all four legs of the ladder were on the floor when DeVallee was climbing the ladder. Werner argues that this testimony cuts to the heart of Ryan's theory of causation, which rests on the assumption that racking brought one of the ladder's legs off the ground. Werner argues that because Ryan's expert testimony is contrary to these essential facts, his opinion is entitled to no weight. And because

12

Ryan's testimony was DeVallee's only evidence on causation, Werner reasons that DeVallee's case should founder.

A "producing cause" is a substantial factor in bringing about the injury and without which the injury would not have occurred. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 541 (Tex. 2011). A finding on the element of causation may be based on either direct or circumstantial evidence, but it cannot be supported by mere conjecture, guess, or speculation. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003) (per curiam). When an expert opinion "is admitted in evidence without objection, it may be considered probative evidence even if the basis of the opinion is unreliable." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Conclusory or speculative opinion testimony is not relevant evidence because it does not make the existence of a material fact more or less probable. *Coastal Transp. Co. v. Crown Cent. Petro. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Expert testimony is conclusory if the factual basis offered provides no support for the opinion. *Pollock*, 284 S.W.3d at 818.

"When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Rogers v. Zanetti*, 518 S.W.3d 394, 410 (Tex. 2017) (cleaned up) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). When the factual basis for the expert's opinion is in "fatal tension" with the undisputed facts, it cannot support a competent opinion. *Id.* In *Crye*, for example, an expert testified that a topical spray caused the plaintiff to contract frostbite on her foot, but his opinion was

13

based on the twin assumptions (1) that there was no redness on the plaintiff's foot after the product was applied and (2) that the plaintiff misused the product. *Crye*, 907 S.W.2d at 499. The court held that the expert's opinion was entitled to no weight because his assumptions varied from actual facts as they were observed by the plaintiff's husband, who saw her foot turn red, and by the plaintiff herself, who testified that she did in fact use the product as directed. *Id.*

Werner argues that, like *Crye*, Ryan's expert testimony is fatally inconsistent with the material facts as they were observed by those who saw the accident. To that end, Werner emphasizes DeVallee's testimony that as far as he saw, all the ladder's legs were on the ground when he climbed the ladder:

> Q. When you were climbing the ladder and before you climbed the ladder, did you notice whether or not all four feet were on the floor?
>
> A. Yes, all four feet were firmly on the floor.
>
> . . . .
>
> Q. Okay. Were all four feet of the ladder on the floor?
>
> A. Yes.
>
> Q. Okay. It was not racked?
>
> A. It could have been, and maybe I didn't notice. I don't know. You're asking questions I can't answer.
>
> Q. You told me you confirmed that all four feet of the ladder were on the floor.
>
> A. That's correct.
>
> Q. You confirmed that?

14

A.      Yes.

. . . .

Q.      Well, what you know is it wasn't racked to the extent that the ladder was unstable for you.  True?

A.      It didn't appear to be unstable enough for me.

As Werner points out, Vance's testimony corroborated DeVallee's observations concerning the placement of the ladder's legs:

Q.      Okay.  Did you see whether he had all four feet on the floor?

A.      All four feet were on the floor.

. . . .

Q.      As he climbed up the ladder, did all four feet of the ladder maintain contact with the floor?

A.      Yes, sir.

Q.      Did you ever see any of the four feet of the ladder move?

A.      Yes, sir.

Q.      When?

A.      When he tipped over, he reached down and grabbed, and the ladder—the feet on the—this side, the ladder just tipped over.  So these two feet on this side left the ground.

Q.      Before he tipped over, okay, before there was a problem—

A.      Uh-huh.

Q.      —at any time did you see the—any of the four feet on the ladder move?

A.      No, sir.

15

According to Werner, Ryan's expert testimony was in "fatal tension" with the facts as they were reported by those who actually saw the accident, DeVallee and Vance. *See Rogers*, 518 S.W.3d at 410. But the rule described in *Crye* only applies when the expert's assumptions conflict with the "actual, undisputed facts." 907 S.W.2d at 499. Whether the ladder racked was the most hotly disputed issue in the case, not an undisputed fact that may be decreed the "actual" truth—at least, not by anyone who did not sit in the jury box. Rather, the factfinders heard all of the disputed evidence, and we feel confident that they were in a better position to resolve this factual conflict than those whose only exposure to the truth of the case comes through dry ink and paper.

Moreover, Ryan did not rest his theory on untested assumptions. He based his opinion on his independent tests of a similar ladder, the physical condition of DeVallee's ladder after the accident, and the circumstantial evidence. To the extent that there is any conflict between Ryan's theory of the accident and the fact witnesses' testimony, Ryan made allowances for and explained those conflicts. Ryan testified that racking could occur *even if* all four legs were originally placed evenly on the ground. And in his view, there were gaps in the fact witnesses' perception of how the accident unfolded, and he fit his theory into those gaps. He testified that an observer who stood twenty feet away, such as Vance, might have easily missed the racking. To wit, DeVallee himself acknowledged that the ladder might have been racked but that he simply did not notice it. Thus, the gaps in the witnesses' perception of the accident left room for

16

the core of Ryan's theory. In short, we do not have a fatal conflict between undisputed facts and expert assumptions. We therefore cannot agree that Ryan's opinion was mere *ipse dixit* of the sort that is allowed no weight in our assessment.

Moreover, contrary to Werner's assertions, Ryan's testimony was not DeVallee's only evidence on causation. Rather, Werner's own expert Frederick Bartnicki agreed that the only two reasonable possibilities as to what caused the bent leg were (1) racking or (2) that DeVallee fell onto the ladder's leg. But DeVallee advanced other evidence to negate the possibility that DeVallee fell onto the ladder's leg. With that possibility eliminated, only racking remained as a possible cause. Thus, the jury could have rationally relied on Bartnicki's testimony as evidence that racking caused the accident.

Of course, the overall thrust of Bartnicki's testimony was to undercut DeVallee's theory of the case. But to that extent, all that Bartnicki's testimony establishes is that this was a "battle of competing experts," and thus it was "the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony." *See Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied). We defer to that resolution on appeal and hold that the evidence is legally sufficient to demonstrate causation. With legally sufficient evidence to support the existence of a design defect that caused DeVallee's injury, we need not consider Werner's argument that the evidence is legally insufficient to support the jury's finding that a marketing defect caused DeVallee's injury.

We therefore overrule Werner's first issue.

17

## IV. Legal and Factual Sufficiency of the Evidence on Damages

We next consider Werner's second and third issues. In its second issue, Werner challenges the legal sufficiency of the evidence to support the existence and extent of future damages. In its third issue, Werner challenges the factual sufficiency of the same proof, arguing that the future damages that the jury found were excessive in relation to the state of the evidence. For the reasons that follow, we conclude that there is more than a scintilla of evidence to support future damages. However, we agree that one category of future damages was excessive and not supported by factually sufficient evidence. We therefore suggest remittitur.

### A. Standard of Review and General Applicable Law

We employ the same legal-sufficiency standard set forth above. The standard of review for an excessive-damages complaint is factual sufficiency of the evidence. *Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). We will set aside a finding for factual insufficiency only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the answer should be set aside and a new trial ordered. *Campbell v. Pompa*, 585 S.W.3d 561, 571–72 (Tex. App.—Fort Worth 2019, pet. denied). When conducting a factual-sufficiency review, the court of appeals should not substitute its judgment for that of the jury. *Windrum v. Kareh*, 581 S.W.3d 761, 781–82 (Tex. 2019). Accordingly, the court of appeals may not

pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result. *Mar. Overseas*, 971 S.W.2d at 407. An opinion reversing for factual insufficiency must detail the relevant evidence and clearly state why the jury's finding is so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Windrum*, 581 S.W.3d at 781–82.

When someone suffers personal injuries, the damages fall within two broad categories—economic and noneconomic damages. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex. 2003). Economic damages are those that compensate an injured party for lost wages, lost earning capacity, and medical expenses, while noneconomic damages include compensation for pain, suffering, mental anguish, disfigurement, and physical impairment. *Id.* These categories of noneconomic damages may overlap. *Id.* at 770. In this case, the trial court instructed the jury not to compensate twice for the same injury. Under *Golden Eagle Archery*, we presume that the jury followed these instructions and did not award damages for one element more than once unless the record shows otherwise. *Id.* at 771; *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 555 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

When, as here, a factual-sufficiency challenge is made to all overlapping categories of damages, the reviewing court should consider losses or injuries for which the jury could have compensated the injured party under a different category. *See Golden Eagle Archery*, 116 S.W.3d at 773. We review each category of damages awarded,

19

considering the evidence unique to each category, to determine whether the award for that category is against the great weight and preponderance of the evidence. *Id.* "If, after considering evidence unique to a category, the court concludes that the jury's failure to award larger damages for that category is against the great weight and preponderance of the evidence, it should then consider all the overlapping evidence, together with the evidence unique to each other category to determine if the total amount awarded in the overlapping categories is factually sufficient." *Id.*

With respect to recovery of future damages, Texas follows the reasonable-probability rule. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 654 (Tex. 1999). To meet the reasonable-probability test, the plaintiff must: (1) present evidence that, in reasonable probability, he will incur damages in the future, and (2) prove the probable reasonable amount of the future damages. *Id.* at 654–55. To recover damages for future mental anguish, the plaintiff must demonstrate a reasonable probability that compensable mental anguish will persist. *Anderson*, 550 S.W.3d at 619.

"In the search for a quantifiable standard to tether an analysis, courts may also look to awards in similar cases for guidance on whether the award under review is excessive." *Gordon v. Redelsperger*, No. 02-17-00461-CV, 2019 WL 619186, at *5 (Tex. App.—Fort Worth Feb. 14, 2019) (mem. op.), *supplemented*, No. 02-17-00461-CV, 2019 WL 1065916 (Tex. App.—Fort Worth Mar. 7, 2019, no pet.) (mem. op). "Even though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is

20

excessive." *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 872 (Tex. App.—Fort Worth 2005, no pet.). Inflation may explain part of the disparity between awards, especially as to older cases. *See Gordon*, 2019 WL 619186, at *11.

## B.    Future Physical Pain and Mental Anguish

The jury awarded DeVallee $1,500,000 to compensate him for his future pain and mental anguish.

### 1.    The Law

Noneconomic damages, such as mental-anguish damages, cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment. *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017); *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017). "[G]iven the impossibility of any exact evaluation of mental anguish, juries must be given a measure of discretion in finding damages, though that discretion is limited." *Bennett*, 525 S.W.3d at 648 (cleaned up). However, juries cannot simply pick a number and put it in the blank. *Id.* "They must find an amount that, in the standard language of the jury charge, would fairly and reasonably compensate for the loss." *Id.* (cleaned up). The amount awarded must be fair and reasonable compensation, given the evidence presented. *Id.* "Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both." *Id.* (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)). "Appellate courts must conduct a meaningful evidentiary review of these determinations." *Id.*

21

To support an award of mental anguish damages, there must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). Ordinarily, mental anguish damages cannot be awarded without either direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz*, 925 S.W.2d at 614. The supreme court recently described these rules as "strict evidentiary requirements" that owe their existence to the court's concern that mental anguish must be "genuine[]:" "The existence of mental anguish is inherently difficult to verify." *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018).

However, "some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995)). "Where serious bodily injury is inflicted involving fractures, dislocations, etc., and results in protracted disability and confinement to bed, we know that some degree of physical and mental suffering is the necessary result." *Id.* (quoting *Brown v. Sullivan*, 10 S.W. 288, 290 (Tex. 1888)). "Pain and suffering may be inferred or presumed as a consequence of severe injuries." *Burry*, 203 S.W.3d at 552.

"The presence or absence of pain, either physical or mental, is an inherently subjective question." *Gordon*, 2019 WL 619186, at *4 (quoting *Burry*, 203 S.W.3d at 551). "The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* "Pain and suffering may be inferred or presumed as a consequence of severe injuries." *Burry*, 203 S.W.3d at 552. The amounts of damages awarded for pain and suffering are necessarily subjective, and each case must be judged on its own facts. *Gordon*, 2019 WL 619186, at *4 (quoting *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.)). Once the existence of some mental anguish has been established, there is little objective way to measure the adequacy of the amount awarded as compensation. *Id.*

"Mental anguish and physical pain are often combined, as here, into a single element of damages." *Dabbs v. Calderon*, No. 01-14-00598-CV, 2015 WL 4930622, at *4 (Tex. App.—Houston [1st Dist.] Aug. 18, 2015, pet. denied) (mem. op.). When there is one combined award for mental anguish and physical pain, sufficient evidence of either physical pain or mental anguish could support the award. *Id.* (quoting *Figueroa*, 318 S.W.3d at 63).

## 2. The Evidence

With those standards in mind, we proceed to review the record evidence.

DeVallee explained that he had multiple surgeries to address his injuries. He testified that after his accident, an external fixation device was attached to the bones on

23

his arm by the time he awoke from surgery. He had another surgery to remove the fixation device a month or so after the accident, and yet another surgery to put two pins into his radius and ulna to keep them straight. His radius and ulna had been crushed, so doctors had to cut them down, leaving his right arm a half-inch shorter than his left. Doctors then performed a carpal tunnel release procedure, which according to DeVallee caused a great deal of pain. Moreover, unfortunately, doctors did the procedure on the wrong nerve, leading them to remove that nerve entirely. Doctors also did another procedure where they tucked a damaged nerve into a muscle so that it wouldn't grow back.

By DeVallee's account, the injuries and the resulting surgeries had left him with persistent pain that had only gotten worse over time. He reported that at the time of trial, the pain was radiating from his wrist area up into his forearm, bicep, and the back of his neck. DeVallee also had occasional stabbing pains in his hand. He explained that he can reduce pain by taking medication and that he sometimes uses a wrist splint but did so only sparingly because it affected his work. As to mental anguish, he explained that he had five or six appointments with a counselor sometime within the three years prior to trial, but he had no further mental-health treatment.

DeVallee's brother Peter Vale testified that the accident brought about a significant change in DeVallee's demeanor. Vale attested that he could see that DeVallee had lost confidence in himself. Vale said that DeVallee no longer exercised much because it caused his hand to throb, and while he tried to fight through the pain

and remain active, the next morning he would invariably have his arm packed in ice or under a heating pad. According to Vale, DeVallee took many pain killers, but Vale could see he was nonetheless often in pain.

Dr. Susan Garrison also gave testimony on DeVallee's pain and mental anguish. According to Dr. Garrison, DeVallee reported that his hand hurt so much he had to put it between two pillows at night to sleep. When Dr. Garrison saw him in 2013, DeVallee said his pain was at a two out of ten but that it would randomly spike past ten a few times a month. As of March 2016, DeVallee reported to Dr. Garrison that his pain was at a level of four out of ten almost all the time. By 2016, the pain had started radiating up into his bicep.

She testified that when she spoke to him the evening before trial, he said his pain had progressed to a constant level of five or six. DeVallee also told Dr. Garrison that the pain had recently started radiating up into his neck. Dr. Garrison believed that DeVallee suffered from traumatic arthritis, depression, and posttraumatic stress disorder.

According to Dr. Garrison, doctors tried a nerve block to help DeVallee with his pain, but the block was only temporarily successful. She explained that as of 2018, DeVallee was not taking hydrocodone but that he would like to be taking it. Instead, he was then taking prescription strength ibuprofen three times a day. She explained that doctors had proposed a wrist-fusion surgery to address his persistent pain, but such a surgery would eliminate what limited range of motion he had left.

### 3.     Our Analysis

We find parallels between the facts of this case and several comparable arm- and leg-injury cases, as well as cases that involve severe injuries sustained during traumatic falls.  A comparison between those cases and this one leaves us with the conclusion that $1,500,000 was not excessive in relation to the evidence of DeVallee's future pain and mental anguish.

In *Sunbridge Healthcare Corp. v. Penny,* the Texarkana court held that $1,000,000 was not an excessive award for physical pain and mental anguish from injuries sustained in a fall caused when a nursing home attendant let an elderly woman's wheelchair roll down a small flight of stairs—an accident that caused unspecified injuries and the plaintiff's death after a four-day convalescence.  160 S.W.3d 230, 252, 255 (Tex. App.—Texarkana 2005, no pet.).  In *Cresthaven Nursing Residence v. Freeman*, where the plaintiff suffered from a broken leg sustained after nursing home personnel dropped her, the plaintiff agreed to remit a pain and mental anguish award of $4.5 million down to $1 million at the appellate court's suggestion.  134 S.W.3d 214, 228–30 (Tex. App.—Amarillo 2003, no pet.).  In *Turner v. Duggin*, the Texarkana court upheld, as legally and factually sufficient, a $350,000 award for future physical pain and mental anguish for a

severe dog bite that resulted in multiple surgeries and persistent pain in the plaintiff's leg. 532 S.W.3d 473, 482–83, 486 (Tex. App.—Texarkana 2017, no pet.).[2]

*Marquette Transportation Co. Gulf-Inland, LLC v. Jackson* is worth special attention for its parallel to this case. No. 01-10-01025-CV, 2012 WL 1454476, at *10 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.). There, the court upheld awards of $1 million for past physical pain and mental anguish and $500,000 for future physical pain and mental anguish on similar facts as we have here regarding injury, treatment, and impact-on-life:

- A severely broken leg. *Id.*

- Multiple surgeries including installation of an external fixator to save the leg and a soft tissue surgery. *Id.*

- Permanent pain from injury that could potentially be improved with another surgery. *Id.*

- Mental anguish evidence that the plaintiff spent roughly a year highly depressed and refused to leave his room, with extreme negative feelings about life. *Id.* at *11.

From a legal-sufficiency perspective, we find more than a scintilla of evidence to support this award of damages. Likewise, from a factual-sufficiency perspective, we

---

[2] *See also Arnold v. Louisville Ladder Grp., LLC*, No. 03-1266, 2004 WL 5572033, at *3 (C.D. Ill. Feb. 9, 2004) (order) (collecting verdicts for limb injuries in ladder-fall cases).

cannot say that the evidence unique to this category is so weak or so contrary to the overwhelming weight of all the evidence that the award is excessive. *See Golden Eagle Archery*, 116 S.W.3d at 773. DeVallee presented a good case concerning the increasing levels of nerve pain he had suffered over time, as well as the reasonable likelihood that that trend of escalation would continue in the future. While his evidence on mental anguish was less compelling, "some degree" of future mental anguish may be inferable from the extent of DeVallee's persistent injuries, pain, and impairment. *See Fifth Club*, 196 S.W.3d at 797. Furthermore, because the pain and mental anguish questions were submitted together in broad form, we find it "difficult, if not impossible" to "ascertain[] the amount the jury awarded for each element of damages," such that we could deem excessive the portion of the award that was attributable to mental anguish. *See SunBridge*, 160 S.W.3d at 248. Comparable cases have earned $1,000,000 awards, and to whatever extent the award in this case may outshine its peers, the steady march of inflation may help explain the gap. *See Gordon*, 2019 WL 619186, at *5, *11. Therefore, even though the evidence "would clearly support a different result," *see Mar. Overseas*, 971 S.W.2d at 407, we will not substitute our own assessment of the evidence for the jury's. *Windrum*, 581 S.W.3d at 781–82. To that extent, then, we overrule Werner's second and third issues.

## C.  Future Disfigurement

The jury awarded DeVallee $100,000 for future disfigurement.

### 1. The Law

Disfigurement is "that which impairs or injures the beauty, symmetry, or appearance of a person . . . ; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960); *Marquette*, 2012 WL 1454476, at \*14; *Pendergraft v. Carrillo*, 273 S.W.3d 362, 367 (Tex. App.—Eastland 2008, pet. denied); *SunBridge*, 160 S.W.3d at 252. "Disfigurement can include surgical scars, even if they are in a location usually covered by clothing, or anything else that impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 758–59 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g) (internal quotation omitted). "[T]here logically may be some overlap among the physical impairment, pain, suffering, mental anguish, and disfigurement categories of non-economic damages." *Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 846 (Tex. App.—Fort Worth 2018, pet. granted) (mem. op.) (quoting *Day v. Domin*, No. 05-14-00467-CV, 2015 WL 1743153, at \*2 (Tex. App.—Dallas Apr. 16, 2015, no pet.) (mem. op.)).

### 2. The Evidence

According to DeVallee, the injury and the multiple resulting surgeries left his right arm a half inch shorter than his left, damaged his nerves, and caused significant scarring. Dr. Garrison relayed that the scarring was so extensive that it required its own reduction surgery, and DeVallee offered photographs showing that significant disfigurement remained even after this corrective surgery. Finally, Dr. Garrison

29

confirmed that DeVallee had difficulty using his fingers because of nerve damage and that the feeling in his arm would not return.

### 3. Our Analysis

We find the evidence legally sufficient to support the award for future disfigurement. Furthermore, we find nothing excessive about the jury's $100,000 award based on our assessment of the record evidence, as informed by other Texas arm- and leg-injury opinions.

In *Marquette*, for example, the court upheld a $500,000 past disfigurement award and a $500,000 future disfigurement award against a factual-sufficiency challenge, citing the plaintiff's broken leg, scarring, skin grafts, and defects that caused persistent swelling. *Marquette*, 2012 WL 1454476, at *14–15. In *Firestone Tire & Rubber Co. v. Battle*, the court upheld as nonexcessive a $110,000 award (in 1988 dollars no less) for past and future disfigurement for a severely marred and broken hand, where multiple surgeries were required following a products-liability accident. 745 S.W.2d 909, 917 (Tex. App.—Houston [1st Dist.] 1988, writ denied). In *Diamond Offshore Services, Ltd. v. Williams*, the court affirmed an award of $325,000 for future disfigurement where plaintiff suffered from "foot drop" due to nerve damage, could not extend his toes, dragged his foot when he walked, and suffered from a noticeable limp. 510 S.W.3d 57, 76–77 (Tex. App.—Houston [1st Dist.] 2015), *rev'd on other grounds*, 542 S.W.3d 539 (Tex. 2018).

In light of the substantial evidence unique to this category and the significant awards in other cases based on analogous facts, we find nothing excessive about the jury's award for future disfigurement. *See Golden Eagle Archery*, 116 S.W.3d at 773. To that extent, we overrule Werner's second and third issues.

## D.     Future Physical Impairment

The jury awarded DeVallee $1,500,000 for future physical impairment.

### 1.     The Law

The charge in this case did not define physical impairment. Without a definition of physical impairment in the charge, appellate courts look to the commonly understood meaning of the term physical impairment. *Gordon*, 2019 WL 619186, at *13. Thus, in *Gordon*, we defined the common meaning of "physical" as "of or relating to the body," and the definition of "impair" as "to diminish in quantity, value, excellence, or strength." *Id.* So defined, physical impairment encompasses the loss of enjoyment of life or the loss of the injured party's former lifestyle. *Burry*, 203 S.W.3d at 554. "To recover damages for physical impairment, the plaintiff must show that (1) he or she incurred injuries that are distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damage elements and (2) these distinct injuries have had a 'substantial' effect." *Id.* at 555. "If other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Id.* "Texas courts are wary of recoveries for physical impairment because of

31

the vague line of demarcation between damages for physical impairment and other categories of nonpecuniary damages." *Gordon*, 2019 WL 619186, at \*13.

Evidence of impairment may include, for example, whether

(1) impediments to the plaintiff's non-work-related activities are obvious from the injury itself; or (2) the plaintiff produces some evidence of specific non-work-related tasks or activities he can no longer perform. Examples of injuries or limitations that have been held to be legally sufficient evidence of physical impairment include difficulty eating and communicating with others; continuing inability to sleep due to sharp pains, plus inability to run, bicycle, participate in triathlons, and play with children; past inability to walk and future difficulties in running, standing, and climbing; inability to ascend or descend stairs or kneel and difficulty in standing for long periods of time; loss of seventy-five percent of strength in left arm, which subsequently contributed to plaintiff's falling, breaking her leg, and being confined to a wheelchair; and difficulties performing yard work, car maintenance, and playing racquetball.

*Id.* at \*14 (quoting *Patlyek v. Brittain*, 149 S.W.3d 781, 787 (Tex. App.—Austin 2004, pet. denied) (op. on reh'g)).

## 2. The Evidence

DeVallee testified that as a right-hand dominant person, the injury impaired his ability to care for himself, affecting everything from brushing his teeth (which he was forced to do left-handed with an electric toothbrush) to shopping at the grocery store (where he had difficulty picking up bags and often dropped things). He explained that every time he lifted something, there was a consequence in terms of pain, which made him think twice before acting.

DeVallee said that when the accident occurred, he was active and in the best shape of his life. Following the accident, he tried to work out at the gym as before, but

he could not.  The injury also impacted his jogging; the longer he jogged, the more his hand throbbed.  Swimming did not work as exercise either.  However, he conceded on cross-examination that he had run in nineteen organized races since the accident.

By Vale's account, DeVallee was very active, independent, and athletic before the accident.  DeVallee was an active mountain biker, ran frequently, and spent a good amount of time at the gym.  But many of those activities stopped after the accident.  Vale said the accident also fundamentally changed how DeVallee goes about his daily activities:  "[H]aving spent a lifetime being, you know, so physical, he had a lot of confidence in his own abilities.  And he would be more likely to go do exciting, adventurous things, where now I find he's much more reserved."  Vale further confirmed that, due to DeVallee's righthandedness, following the accident there was "a lot he couldn't do.  And he was heavily medicated, so we just tried to help out as much as we could with everything."  Vale often had to do things for DeVallee that he ordinarily would have done for himself prior to the accident.  By Vale's account, he could see DeVallee's loss of confidence.  DeVallee had a girlfriend at the time of accident, but he had not had any relationships since.

On cross-examination, Vale conceded that DeVallee has been successful in his career since the accident and that DeVallee still ran long-distance races.  Vale also acknowledged that DeVallee had lived alone for years at the time of trial, that he does housework by himself, and that he was self-sufficient in bathing, dressing, and cooking his own meals.

Dr. Garrison also offered insights into DeVallee's impairment. As she described it, DeVallee had a greatly decreased range of motion, and he could not make a fist with his dominant hand. She explained that doctors had proposed a wrist-fusion surgery to address his persistent pain, but such a surgery would eliminate what limited range of motion was left. Ultimately, she rated his right-arm impairment at 13% or 14%, whereas his whole-body impairment rating was 8%. The pain and lack of fine motor skills stood in the way of things like getting dressed and his previous hobbies of gardening and bowling. However, she conceded that DeVallee was still a frequent runner of races and had done one half-marathon since the accident.

### 3. Our Analysis

There is more than a scintilla of evidence to support the damages for future impairment. But several factually equivalent arm- and leg-injury cases with dramatically lower awards suggest that the figure of $1,500,000 is excessive in relation to the record evidence.

In one case, the court found the evidence sufficient to support a $20,000 future impairment award for a broken wrist and ankle, which came with lost strength, persistent pain, "limited his ability to lift things," limited ability to run or walk at pace, arthritis that would impact his daily activities, and the potential need for wrist-fusion surgery. *Barnhart v. Morales*, 459 S.W.3d 733, 746–47 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

34

In another case, the court held the evidence sufficient to support a $1,000,000 future impairment award based on a severe injury that crippled both hands, based on the following impairment evidence:

> Preston is unable to do many everyday tasks like open a water bottle or button his shirt. His ability to write is very limited because of the pain writing causes. He can use a computer by pecking with a middle finger and a thumb. Although Preston showed incredible determination and character by working hard to make the varsity football team his senior year in high school, he still could not be a receiver or play baseball. He cannot throw or catch a baseball. His ability to do many things he once enjoyed is limited.

*Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165–66 (Tex. App.—Eastland 2009, pet. dism'd).

In still another case, the court held the evidence sufficient to support awards of $500,000 for past impairment and $500,000 for future impairment in connection with a severely broken leg, based on the following evidence: "[B]efore his accident he was athletic and liked to play basketball, softball, and volleyball and to rollerskate with his brothers and his sons. He also testified that he had been living with his girlfriend and had been planning to ask her to marry him, but he had to postpone those plans indefinitely to move in with his parents because he was no longer able to care for himself following the accident." *Marquette*, 2012 WL 1454476, at *13. Also there were "gait deficiencies" and "rotational abnormalities" that resulted in "a permanent limp" and a loss of sensation in the injured party's foot. *Id.* The injury meant that "he would never be able to run again" and "he's not going to be equal and as agile as he was"; a

35

doctor also testified that the injured party Jackson "should probably put a 'one-hour limit' on the amount of walking and standing that he does each day. As a result, both Jackson and his mother testified that Jackson was unable to do many common household tasks, such as cooking and cleaning." *Id.*

And perhaps the most salient comparator is *Battle*, where a man in his mid-40's sustained fractures in his right hand and crushed bones in his left wrist. *Battle*, 745 S.W.2d at 917. The injuries were so severe that he was left with drastic limitations of the motion in his hand and wrist, "virtually no grip strength," and practically no use of his hand at all. *Id.* To compensate him for the complete loss of use and enjoyment of his appendages, the jury awarded $142,500 for past and future physical impairment. *Id.*

Based on this state's laws and this case's facts, we must conclude that the award of $1,500,000 for future impairment was grossly out of step with what the evidence justified, as measured against the consensus of comparable cases. Much of DeVallee's case centered on his pain and its impact on his life, and to the extent that he experienced impairment, it appeared to be hardly "distinct from, or extend beyond, injuries compensable as pain and suffering." *See Burry*, 203 S.W.3d at 555. When filtering for pain-related evidence, DeVallee was left with only modest evidence unique to future impairment. *See Golden Eagle*, 116 S.W.3d at 773. That proof cannot compete with the contrary evidence that DeVallee was only 13% disabled in one arm, such that he remained able to work, was self-sufficient enough to live alone, and could regularly run races. Those facts beg for comparison with a case like *Battle*, wherein it appears that

36

both the plaintiff's appendages were nearly completely disabled from a similar set of fractures, and yet he received an award for past *and* future impairment that was ten times lower than DeVallee's award for future impairment alone. While DeVallee lost the enjoyment of certain hobbies, there is no view of the record that could warrant such steep relief. Therefore, based on the evidence unique to the category of future physical impairment, we must conclude that the award for this category is against the great weight and preponderance of the evidence. *See id.*

### E. All Overlapping Noneconomic Damages

Having determined that the evidence unique to impairment is insufficient to support that award, our next task, as we understand it, is to consider all the evidence of noneconomic damages together in order to determine whether the total amount awarded in all the overlapping noneconomic categories is factually sufficient. *Id.*; *Burry*, 203 S.W.3d at 555. We "take[] into account all the evidence regarding damages in categories that overlap, but [we] do[] not credit that evidence more than once in evaluating the amount awarded by the jury." *Golden Eagle Archery*, 116 S.W.3d at 773.

For all the overlapping categories of future noneconomic damages, the jury awarded DeVallee a total of $3,100,000 ($1,500,000 for future pain and mental anguish, $100,000 for future disfigurement, and $1,500,000 for future physical impairment). Above, we have laid out all of the evidence pertaining to that sum, and we need not recapitulate it again here. It is enough to say that after reviewing the totality of that evidence, we remain convinced that the whole is just as unwarranted as its faulty part

37

(impairment); DeVallee's evidence on future disfigurement and future pain and mental anguish was not so powerful that it could make up for the patent deficiencies in his future impairment evidence.

We therefore hold that the evidence is factually insufficient, and we suggest a remittitur of $1,000,000, owing to the inadequacy of the evidence with regard to future impairment. To that extent, we overrule Werner's second issue and sustain its third.

## F. Future Medical Care

Next, Werner attacks the factual sufficiency of the evidence to support the award of $460,377.15 for DeVallee's future medical care. But Werner's approach to challenging this award is a bit different from its other challenges. Rather than calling the award excessive in general, Werner maintains that certain types of expenses should be categorically unavailable because they are not "medical" in essence, such as the amounts that DeVallee requested for his home and lawn maintenance expenses, occupational and recreational therapy, gym membership, and roadside assistance.

As Werner's sole support for its position that these sums are not medical and thus not compensable, Werner cites *SeaRiver Maritime, Inc. v. Pike*, No. 13-05-0033-CV, 2006 WL 1553264, at *5–6 (Tex. App.—Corpus Christi–Edinburg June 8, 2006, pet. denied) (mem. op.). The *SeaRiver* court suggested remittitur for a future medical award, reasoning, "Cutting grass and handyman services are not ordinary and necessary medical expenses. No medical testimony supported the necessity for this, nor was it

38

prescribed.  Vocational therapy and rehabilitation are not medical expenses though they were part of Dr. Voogt's testimony." *Id.*

However, *SeaRiver* offered no authority for this holding, and our research has revealed a wealth of Texas[3] and federal[4] cases that have either issued or upheld awards

[3] *See, e.g.*, *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 312 (Tex. App.—Houston [14th Dist.] 2019, pet. filed) (upholding $500,000 future medical award based in part on evidence about plaintiff's need for assistance with "housekeeping[] and activities of daily living"); *Integrated of Amarillo, Inc. v. Kirkland*, 424 S.W.3d 131, 139 (Tex. App.—Amarillo 2014, no pet.) (upholding award of $13,000 for home renovations as part of medical expenses); *Rentech Steel*, 299 S.W.3d at 164 (upholding an award of nearly $3 million that included amounts for home maintenance, a bookkeeper, a housekeeper, and a home health aide); *Baptist Mem'l Hosp. Sys. v. Smith*, 822 S.W.2d 67, 79 (Tex. App.—San Antonio 1991, writ denied) (upholding $1.3 million future medical award for "medical, nursing, and custodial expenses"), *abrogated in part on other grounds by Sampson v. Baptist Mem'l Hosp. Sys.*, 940 S.W.2d 128 (Tex. App.—San Antonio 1996), *rev'd*, 969 S.W.2d 945 (Tex. 1998).

[4] *See, e.g.*, *Low v. United States*, 795 F.2d 466, 471–72 (5th Cir. 1986) (upholding $1,275,000 medical award, including amounts for physical and occupational therapy); *Early v. United States*, 474 F.2d 756, 759 (9th Cir. 1973) (upholding joint award of $55,000 for future medical, housekeeping, and medication expenses); *In re Otero Cty. Hosp. Ass'n, Inc.*, No. 11-11-13686 JL, 2018 WL 893789, at *14 (Bankr. D.N.M. Jan. 30, 2018) (mem. op.) (issuing $215,000 award for future medical needs that encompassed "rehabilitation, including physical therapy sessions and a gym membership; and . . . professional maid/caregiver service three times per week"); *Hendrickson v. United States*, No. 11CV1746-LAB NLS, 2014 WL 7915313, at *5 (S.D. Cal. June 20, 2014) (awarding $1,846,780 for in-home medical assistance and housekeeping assistance in the future); *McCuller v. Nautical Ventures, LLC*, No. CIV.A. 05-1195, 2012 WL 4416979, at *3 (E.D. La. Sept. 25, 2012) (findings & conclusions) ("Accordingly, the Court finds that Mr. McCuller's future medical costs include a one-time gym membership initial fee and a monthly fee thereafter, for life."); *see also Wareing ex rel. Wareing v. United States*, 943 F. Supp. 1504, 1538 (S.D. Fla. 1996) (quoting *Muenstermann v. United States*, 787 F. Supp. 499, 516 (D. Md. 1992)) (approving language stating that future needs may include seven categories of damages, such as "attendant care" and "transportation"; "None of these categories of rehabilitative services and future support care expenses have been

under the heading of future medical damages for services that might not be considered strictly medical. We therefore decline to follow *SeaRiver*.

Werner also attacks the jury's award of future medical expenses by arguing against the "life care plan" that Dr. Garrison and another witness developed for DeVallee. Pursuant to the plan, Dr. Garrison recommended certain forms of care to address problems stemming from the accident, such as wrist-fusion surgery to treat his pain and home assistance to perform the household chores that DeVallee could not do on his own. Another witness, Ginny Stegent, compiled price quotes for what that care would cost.

Werner argues that the care plan was based on out-of-date projections about DeVallee's needs. As Werner points out, DeVallee no longer needed one of the forms of recommended future care—dental surgery—given that the underlying problem had already been corrected. Werner also argues that other forms of care, such as visits to a pain management specialist, were not necessary because DeVallee had not yet taken advantage of those services by the time of trial. Werner argues that Dr. Garrison's out-of-date projections concerning DeVallee's future needs were therefore insufficient to support the award of future medical expenses.

---

thought to be 'novel.'"); Housekeeping and maid services, *2 Stein on Personal Injury Damages Treatise* § 7:19 (3d ed.) (collecting cases that approved medical awards for housekeeping).

In *Burry*, this court addressed a roughly analogous argument, wherein General Motors contended that the appellees' life care plan was speculative because it was based on "out-of-date" data. 203 S.W.3d at 553–54. Namely, the injured party offered a care plan that included an allotment for lost income due to her injuries. *Id.* General Motors protested that this projection was based on an out-of-date employment history because the evidence at trial showed that the injured party had not worked in ten years. *Id.* We held that the lost-earnings award was nonetheless sufficient because the expert who created the plan testified that he had also taken account of present realities in making his projections: he adjusted his projections downward because the injured party had "been out of the labor market for a number of years and wouldn't have started at as high a salary as what she had years ago." *Id.* at 554 (cleaned up). "Thus, Dr. Hansen not only took into account Stacey's past work history and skills, he also expressly adjusted his determination of her earning capacity based on the fact that she had been out of the workforce for some time." *Id.*

Similarly, here, DeVallee's witnesses testified that they adjusted his care plan downward to account for the present realities of DeVallee's case, such as by cutting out the recommended amount related to dental care that was no longer appropriate. And to the extent that the jury's award compensates DeVallee for types of care that he had not yet availed himself of at the time of trial, we do not believe that his lack of availment by itself shows that these types of care were not appropriate. Rather, in its role as the factfinder, the jury could have rationally believed Dr. Garrison's testimony that these

41

types of care were reasonably required in the future, but that DeVallee simply had not had the resources to undergo them. We therefore hold that the evidence is legally and factually sufficient to support the jury's award for future medical care. To that extent, we overrule Werner's second and third issues.

## V.     Exclusion of Evidence

In its fourth issue, Werner protests the exclusion of deposition testimony from a physician who treated DeVallee, Dr. Michael V. Doyle. According to Werner, this testimony would have rebutted the notion that any of the treatment discussed in DeVallee's care plan was reasonably necessary. As Werner summarizes his testimony, "Dr. Doyle could not say with any degree of medical certainty that DeVallee would need any of the items contained in the life care plan." Werner argues that the trial court erred in excluding this testimony.

At trial, DeVallee objected that Dr. Doyle's testimony was misleading, and the trial court excluded the evidence. On appeal, Werner contends that the evidence's probative value far exceeds any potential to mislead the jury. We disagree.

We review a trial court's exclusion of evidence for an abuse of discretion. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015). The trial court has broad discretion to determine admissibility. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). A trial court does not abuse its discretion merely because the appellate court would have ruled differently in the same circumstance. *McGibney v. Rauhauser*, 549 S.W.3d 816, 820 (Tex. App.—Fort Worth 2018, pet. denied). Instead, the appropriate

42

inquiry is whether the court acted without reference to any guiding rules or principles, that is, whether the court's act was arbitrary or unreasonable. *Id.*

Pursuant to Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of misleading the jury. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018) (quoting Tex. R. Evid. 403). Misleading evidence "has variously been defined as evidence the jury cannot properly evaluate, that is hard to understand or apply, that is likely to be misunderstood, or that the jury will likely give undue weight." *In re Commitment of Woods*, No. 02-19-00155-CV, 2020 WL 3969958, at *12 (Tex. App.—Fort Worth June 11, 2020, pet. denied) (mem. op.) (citing Charles Alan Wright & Arthur R. Miller, 22A Federal Practice and Procedure Evidence § 5217 n.17 (2d ed. 2020)). "Evidence may qualify as misleading if it has the deceptive veneer of truth—such as the statement taken out of context, the trumped-up statistic, or the suggestion of a defense that has no legal validity." *Id.* (footnotes omitted).

The trial court could have rationally concluded that in Werner's hands, this evidence had a significant potential to deceive that substantially outweighed its probative value. Werner touted Dr. Doyle's testimony as a rebuttal to Dr. Garrison's opinion that the care she recommended was reasonably necessary—as though Dr. Doyle had studied the issue, made his own assessment, and disagreed with Dr. Garrison's opinion on what care DeVallee needed. But Dr. Doyle's deposition testimony reveals that he made no such studied assessment and had almost no opinions on the matter. Most of his answers were of the indefinite variety—coulds, maybes, or

I don't knows. Dr. Doyle gave the latter answer most frequently of all, replying "I don't know" to questions about whether DeVallee would need pain management treatment, occupational therapy, antidepressant medications, housekeeping, lawn care, and home maintenance. He gave no firm answers whatsoever concerning the care that DeVallee would actually need. If Werner's goal was to use Dr. Doyle's noncommittal responses as a means to rebut Dr. Garrison's testimony about the care that DeVallee needed, it would have been a misleading rebuttal indeed. We therefore conclude that the trial court did not abuse its broad discretion when it excluded this evidence. *See Helena Chem.*, 47 S.W.3d at 499. We overrule Werner's fourth and final issue.

## VI.   Conclusion

The evidence is factually insufficient to support the jury's award of $1,500,000 for future physical impairment. We suggest a remittitur of $1,000,000 on this award. If DeVallee files this remittitur with the trial court clerk within fifteen days of our judgment and notifies this court of such, we will reform the amount of damages and affirm the judgment as modified. *See* Tex. R. App. P. 43.2(b), 46.3. If DeVallee does not timely file the remittitur, we will reverse the trial court's judgment and remand for a new trial on liability and damages. *See* Tex. R. App. P. 44.1(b); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 151–52 (Tex. 2012) (per curiam).

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered:  March 25, 2021

44